UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA,

      -against-                                                     14 CR. 748 (PAE)

DMITRY BRAVERMAN
------------------------------------------------------x


## SENTENCING MEMORANDUM
## ON BEHALF OF DMITRY BRAVERMAN

Silvia L. Serpe
Paul W. Ryan
SERPE RYAN LLP
1115 Broadway, 11th Fl.
New York, NY 10010
212-257-5010
sserpe@serperyan.com

*Attorneys for Defendant Dmitry Braverman*

## Table of Contents

PRELIMINARY STATEMENT ........................................................................................................1

I. PROCEDURAL HISTORY ........................................................................................................3

II. SENTENCING GUIDELINES....................................................................................................3

III. ANALYSIS OF THE 18 U.S.C. § 3553 FACTORS ..................................................................4

    A. Mr. Braverman's Personal History & Characteristics........................................................4

        1. Personal History ...........................................................................................................4

        2. Commitments to Family, Job & Community...............................................................7

            (a) Mr. Braverman is Deeply Devoted to His Family............................................7

            (b) Mr. Braverman is a Selfless Friend................................................................11

        3. Remorse & Acceptance of Responsibility ..................................................................14

    B. The Nature & Circumstances of the Offense Do Not Support a Two Point Enhancement
       and Instead Weigh in Favor of Leniency..........................................................................15

    C. The Need to Promote the Purposes of Sentencing ........................................................21

        1. Mr. Braverman Has Already Been Severely Punished................................................22

        2. The Purposes of Deterrence Have Already Been Served ...........................................23

        3. There Is No Need to Protect the Public From Mr. Braverman .................................24

        4. Mr. Braverman Does Not Need Treatment...............................................................25

    D. The Kinds of Sentences Available ..................................................................................25

    E. The Need to Avoid Unwarranted Sentence Disparities....................................................26

    F. The Need to Provide Restitution .....................................................................................27

CONCLUSION ............................................................................................................................29

## PRELIMINARY STATEMENT

Defendant Dmitry Braverman respectfully submits this memorandum in anticipation of sentencing, which is currently scheduled for July 29, 2015. Mr. Braverman pleaded guilty to insider trading, a violation of the securities fraud statute (15 U.S.C. § 78j(b)).

We respectfully submit that a custodial sentence would be greater than necessary to comply with the purposes of sentencing set forth in Section 3553(a)(2) of Title 18. We hope this Court will consider non-custodial options that will serve as sufficient punishment and satisfy the objectives of the United States Sentencing Guidelines ("Guidelines").

There is no sugar coating what happened here. With the hope of realizing the American Dream and buying his family a home in Northern California, Mr. Braverman wrecked the solid life that he had built for himself and his family in this country. After immigrating from the Ukraine, Mr. Braverman worked for more than thirteen years in the Information Technology ("IT") department of the prominent law firm, Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini" or "the Firm"). He thrived at his job, had numerous friends, and earned the respect of his colleagues. In the fall of 2010, one day while driving home from work, he heard news on the radio about the merger of one of the Firm's clients. Mr. Braverman thought he could capitalize on that type of information in the future. He began making trades based on educated guesses about upcoming mergers of clients of Wilson Sonsini. He did this by searching the Firm's New Matter Intake System for matters categorized as "mergers and acquisitions," and by looking for a spike in the billable time of attorneys, thereby possibly indicating an upcoming deal. Contrary to the Government's suggestions, Mr. Braverman did not use any special computer or programming skills to access or obtain this information. Nor did he ever have access to the Firm's document management system or any documents that detailed the Firm's upcoming mergers. Nonetheless, with the information that Mr. Braverman was able to

1

obtain from the Firm, he made four profitable trades from September 2010 until April 2011, totaling approximately $22,000.00. He also told his brother to purchase stocks in two of these companies.

Then, in early April 2011, an associate in the Firm's Washington, D.C. office was arrested for trading on inside information about corporate deals. Mr. Braverman, now fully recognizing the risks he had been taking, stopped trading for a period of time. But, to his great regret, in late 2012, he again began trading on confidential firm information about potential transactions. This time, he opened a brokerage account in the name of his father-in-law, who resided in Russia, and made four trades from November 2012 to December 2013, with the latter two being his most profitable. In total, Mr. Braverman realized profits of about $304,000.

What Mr. Braverman did is confounding to everyone who knows him. By everyone's account, Mr. Braverman is "kind", "gentle-spirited", "unfailingly pleasant" and "positive", "honest", "reliable", "supportive" and "generous". We are hopeful that after reading the numerous letters submitted on his behalf, the Court will see Mr. Braverman for who he really is:  a loving husband and father, a devoted son and brother, a loyal and giving friend, and a hard worker. It is no exaggeration that everyone who knows Mr. Braverman has depended upon him at some point in their relationship, and has always been able to count on him. Not least within this privileged group is his eight-year old son, "A" – who according to his mother – lives "in a separate universe" with his father. The absence of Mr. Braverman from the life of his only child – even if for a relatively short period of time – will be devastating.  Simply put: the offense conduct is wholly at odds with Mr. Braverman's character.

Mr. Braverman deeply regrets his actions, and he swiftly accepted responsibility, both by pleading guilty and by agreeing to pay the U.S. Securities & Exchange Commission $520,433. He has already suffered severe consequences as a result of his offense: in addition to a felony conviction, he

2

lost a job he loved – and quite possibly his career in the IT sector – his reputation has been indefinitely tarnished by the press coverage, and he faces financial ruin for decades.

For these and the additional reasons set forth below, we respectfully request that Your Honor sentence Mr. Braverman to a non-Guidelines and non-custodial term of imprisonment.

## I.  PROCEDURAL HISTORY

Mr. Braverman was charged in a one count Information and arrested on September 16, 2014, in the Northern District of California where he resides. On September 26, 2014, he made his initial appearance in this Court, and was subsequently arraigned and pleaded guilty on November 13, 2014. Sentencing is currently scheduled for July 29, 2015.

## II.  SENTENCING GUIDELINES

Section 2E1.4 of the Guidelines applies to insider trading. Mr. Braverman disputes the Sentencing Guidelines calculation in the Presentence Investigation Report ("PSR"), which was based on the Government's *Pimentel* letter.[1] Specifically, he objects to the application of a two-point enhancement for abuse of trust/use of a special skill (U.S.S.G. § 3B1.3). Without this two-point enhancement, Mr. Braverman faces a Guidelines range of 24 to 30 months. The calculation is as follows: According to Section 2E1.4, the base offense level is 8. The offense level is increased by 12 levels because his gain from the insider trading was about $304,000.00. *See* U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(G). He is entitled to a three-level reduction for his timely acceptance of responsibility. *Id.* §§ 3E1.1(a) and(b). Thus, Mr. Braverman has a total offense level of 17, and a Criminal History Category of I. Accordingly, the advisory Guidelines range should be 24 to 30 months. For the reasons expressed below, Mr. Braverman requests a non-Guidelines and non-custodial sentence.

---

[1] The PSR characterizes the guideline range of 30 to 37 months as the "Stipulated Guidelines Range". *See* PSR at p.5. This is not accurate, and likely a mistake copied from the *Pimentel* letter, which similarly mischaracterizes the range as "stipulated".

## III. ANALYSIS OF THE 18 U.S.C. § 3553 FACTORS

A sentencing court must consider not only the advisory Guidelines range, but also the sentencing factors set forth in 18 U.S.C. § 3553(a). The overarching mandate of 18 U.S.C. § 3553(a) is to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in Section 3553(a)(2). *See Kimbrough v. United States*, 552 U.S. 85, 111 (2007); *U.S. v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013) (remanding for resentencing where district court "gave only a passing mention to any of the section 3553(a) factors"). This Court should not "presume that a Guidelines sentence is reasonable". *U.S. v. Cavera*, 550 U.S. 180, 189 (2d Cir. 2008). Moreover, as reaffirmed by the Supreme Court, "the punishment should fit the offender and not merely the crime." *Pepper v. U.S.*, 562 U.S. 476, 477 (2011) (quoting *Williams v. People of State of New York*, 337 U.S. 241, 247 (1949)).

Below, we discuss each of the applicable Section 3553(a) factors, and respectfully submit that, on balance, the purposes of sentencing will be met by a non-Guidelines and non-custodial sentence.

### A.   Mr. Braverman's Personal History & Characteristics

Mr. Braverman is a responsible and loving father and husband, a caring brother, and a giving friend who has devoted countless hours of help to family and friends. In this section, we detail the reasons why Mr. Braverman's history and characteristics weigh in favor of a non-Guidelines and non-custodial sentence.

#### *1.   Personal History*

Mr. Braverman is 42 years old. He was born in Odessa, Ukraine. His parents Eteri Zhornitskaya, a retired engineer, and Vyacheslav Braverman, a retired Information Technology manager, have been married for over 40 years, and reside in Boston. Mr. Braverman has a younger

4

brother, Igor, age 35, who recently married. Mr. Braverman is very close to each member of his immediate family, as well as his extended family.

Mr. Braverman grew up in the Ukraine. He was privileged because his parents exposed him to travel and sports beginning at a young age. One long-time family friend describes how growing up their parents were "avid travelers and outdoor enthusiasts" who organized outdoor education programs, such as skiing, white-water rafting and backpacking trips that gave them "confidence and self-esteem" and "stressed [the] importance of cooperation, teamwork and friendship", which were the lessons that Mr. Braverman built upon in his adult life. Ex. 4 (Letter ("Ltr.") of Valerie Yevtushenko).[2]

Mr. Braverman excelled in school, particularly mathematics, which allowed him to attend one of the best high schools in Odessa. After high school, he attended Odessa State University, and after five years, in 1995, obtained a Masters degree in Applied Mathematics. He met his wife, Anastasiya, during his last year of college through his cousin, Natasha, who was her best friend. Anastasiya was born in Russia, but moved to Odessa when she was about thirteen years old. She obtained a Masters degree in Computer Science from Odessa University in 1999. Unfortunately, in 1995, Mr. Braverman's father was diagnosed with bone marrow cancer. At that time, his family was also in the process of arranging for eventual immigration to the United States.

In April 1998, Mr. Braverman and Anastasiya were married in the Ukraine. Shortly thereafter, in April 1999, Mr. Braverman immigrated to the United States with his parents, but without his brother who was finishing his Masters in Odessa, and without his wife, who was not included in the original immigration documentation. Mr. Braverman's grandmother (his father's mother) had already immigrated to the United States with his uncle, and they sponsored Mr.

---

[2] The character letters submitted by Mr. Braverman's relatives are arranged alphabetically and attached as Exhibit 3. The character letters submitted by Mr. Braverman's friends are arranged alphabetically and attached as Exhibit 4.

Braverman and his family as Jewish refugees from the Soviet Union. Although his grandmother lived in Brooklyn, New York, at that time, the family settled in San Francisco because Mr. Braverman's father had a number of friends in that area, and because Mr. Braverman hoped to capitalize on the Silicon Valley job market. Anastasiya immigrated to the United States in the end of 2000. Mr. Braverman became a United States citizen in 2004, and Anastasiya became a citizen in 2007.

When they first immigrated to California, Mr. Braverman lived with his parents' friends. Eventually, he rented his own apartment, where he lived with Anastasiya. His parents also lived with Mr. Braverman. He supported both of his parents financially and emotionally, helped his father obtain proper treatment for cancer, and nursed both of his parents through hip surgeries. Mr. Braverman's brother, Igor, also lived with him for a short period of time after he immigrated to the United States in 2001, and then he attended UCLA, where he obtained a master's degree in electrical engineering. After graduation, Igor lived with Mr. Braverman and Anastasiya for many months and then eventually relocated to Boston to begin a job as an electrical engineer. In 2013, his parents also relocated to Boston because his father found a new doctor there to treat his cancer.

A close family friend depicts how Mr. Braverman dealt with the many challenges that faced him when he first immigrated here:

> I was watching Dmitry taking on this new challenge with honor. He built on the qualities that were already visible during our outdoor trips when he was a child. With great stamina and ability to deal with unknown and unexpected situations, he was taking on the difficult tasks as they came. He was addressing life trials with pride, patience, strength, integrity and admirable maturity. Dmitry was on his own and did not have much in terms of resources when he arrived. He was denying himself some basic essentials, but helping his family who stayed behind, having one goal in mind to bring everyone together. He studied with vigor, he worked hard, and again, he never complained and always smiled. Dmitry's focus and consistency paid off. His family reunited and he became independent, productive and successful member of this community. Growing into a skilled professional, Dmitry shared generously and gave back to those who needed his help now.

> Ex. 4 (Vladimir Yevtushenko Ltr.).

6

After the common struggles associated with immigration, the Bravermans had much to celebrate. Mr. Braverman landed a great job with Wilson Sonsini, where he worked for over thirteen years, earning a title of Senior Information Technology Engineer. Anastasiya became a program manager for a nation-wide distribution company, where she has worked for over 10 years. And last but not least, they have an eight year old boy, "A".

Mr. Braverman's promising life fell apart last September, when he was arrested. After his arrest, Wilson Sonsini placed him on unpaid leave. He resigned a few weeks later after he secured employment with a staffing agency. In early November, he was placed at a company where he worked full time to develop certain software. That project ended on June 5, 2015, and Mr. Braverman has been unemployed since then. Recently, Mr. Braverman has found that even with short term employment, the offers are contingent on a background check.

### 2. *Commitments to Family, Job & Community*

Letters written by Mr. Braverman's family and friends attest to a man of high character. *See* Exs. 2, 3, 4. The one theme that is repeated throughout the letters is his compassion towards his family and friends.

### (a) Mr. Braverman is Deeply Devoted to His Family

Mr. Braverman's father recounts how his son supported the entire family for six years after they immigrated to this country, paying for all expenses, including medical expenses, to care for his father's cancer. But his father also describes something almost miraculous – how with his son's "concern and daily exertions over the course of two years", he was able to stand again and begin walking after having been on crutches and in a wheelchair for three years. He also credits his wife's recovery after her hip surgery to his son's "sympathy, patience and devotion". Finally, he describes how his son helped a six-year old girl who was severely cross-eyed to get admitted to a special clinic

in Odessa where she underwent a successful operation after local doctors had said that they could not help her. *See* Ex. 3 (Vyacheslav Braverman Ltr., Translated).[3]

In her letter to the Court, Mr. Braverman's mother describes the close relationship that she has with her son, speaking with him daily. She also recounts how he helped her to cope with her husband's cancer, and also helped her during a time of need – when both of her hips were replaced. She has spent significant time with her son and his family and has observed what "a wonderful and caring father" he is. *See* Ex. 3 (Eteri Zhornitskaya Ltr., Translated). Although undoubtedly some concepts and emotions may be lost in the translations of his parents' letters, there is no doubt that the person described is a "good person," a "devoted father" and a caring and giving son. *See id.* (Vyacheslav Braverman Ltr., Translated).

Mr. Braverman's "unconditional" love and support also extends to his brother, Igor. Igor describes how his older brother took care of him, babysitting him when he was four years old and Mr. Braverman was only eleven, and how that memory has stayed with him because of how much fun they had together. Igor also writes about how grateful he was to have his older brother help him immigrate to this country and welcome him into his home. He depicts Mr. Braverman not only as his best friend but as "the best brother one can wish for" and as an "honest, principled and hardworking man, who is adored by his family and is well liked by his friends". *See* Ex. 3 (Igor Braverman Ltr.).

Mr. Braverman's mother-in-law – Olga Pupynina – is also uniquely able to comment on Mr. Braverman's character, having known him for more than twenty years and, after the birth of her grandson, having lived months at a time in his home with his family. A theme that runs throughout her observations is his patience and the respect that he has earned from both family and friends. She

---

[3] With respect to letters written in a foreign language, the original letter follows the English translation, which is marked "Translated".

is a "happy mother-in-law" and describes her daughter to be "very lucky". In her translated letter, she remarks that in her daughter's home, there is "mutual understanding and support, an atmosphere of coziness and warmth, where it is comfortable to stay. . .. [and where] relatives and friends are drawn." She appreciates that her son-in-law is fundamentally "good and caring" and raising her grandson to respect old age and to take care of his grandparents. *See* Ex. 3 (Olga Pupynina Ltr., Translated).

Other letters by Mr. Braverman's relatives also recount Mr. Braverman's intelligence, his patience, and his willingness to help in any way – to both family and friends. *See* Ex. 3 Letters by Natalia Khokhlova-Prokovskaya (Anastasiya's aunt observes that Mr. Braverman's "[s]elf-education is another trump card in [his] character, and preciseness . . . sometimes it seems excessive . . . Anything he does, must be done as well as possible."); Arsenia V. Pokrovskaya (Anastasiya's cousin describes how Mr. Braverman spent many hours tutoring her in various subjects); Svetlana Zhornitskaya (Mr. Braverman's aunt describes him as "a very attentive, dedicated and most importantly, patient grandson, helping his grandparents both when he lived in Odessa, and when he moved to the United States as well."); Victor Braverman (Mr. Braverman's uncle describes how after Super Storm Sandy, Mr. Braverman was one of the first to reach out to offer help even though he lived three thousand miles away and noting that "[h]is continuous effort to assist his family/relatives during difficult times has no boundaries."); Igor Pokrovsky (a distant relative describes Mr. Braverman's "sincerity toward the elderly in [their] family"). The resounding sentiment of his relatives is that Mr. Braverman is the "family's golden child". Ex. 3 (Svetlana Krasner Ltr. (cousin)).

People who spend time around Mr. Braverman and his family are struck by the strength of their bonds. His brother-in-law, Richard Johnson, puts it simply: "I had many opportunities to observe first hand Dmitry's relationship with his young son and his wife. I was struck by his obvious patience and love for his son and the strong bond with his wife."

9

Ex. 3; *see also id.* Arsenia V. Pokrovskaya Ltr. (Anastasiya's cousin describes Mr. Braverman's "stunning, warm relationship with his wife").

And no one knows Mr. Braverman better than his wife of seventeen years. In a heartfelt letter, Anastasiya describes her husband as "the most caring, tolerant, kind, interesting person" who "would open his schedule, heart, wallet in a heartbeat." Ex. 2. She recounts an example of his kindness when he sold their first car to a neighbor for half the asking price because that person could not afford to pay more and really needed a car. *Id.* She also describes his unquestionable financial support to her family in the Ukraine, and his unfailing devotion to his father after he was diagnosed with cancer. *Id.* Like others, she notes that she "could always count on Dmitry" and that "one could only hope to have such a great life partner". *Id.*

Anastasiya also describes the type of father that Mr. Braverman (or "Dima") is to their eight-year old son. To say that Mr. Braverman is a very involved father is an understatement. As described by Anastasiya, "Dima is a separate universe for our son." Not only do "[t]hey understand each other and care about each other deeply", but they are "two true best friends." Ex. 2. When he is not working, they are virtually inseparable. Those who have observed them together have described Mr. Braverman not just as a good father, but as a "true friend". Ex. 3 (Arsenia V. Pokrovskaya Ltr.). *See also* Ex. 4 Anna Anisimova Ltr. (describing that Mr. Braverman and his son "are simply one"); Peter Shvets Ltr. (noting Mr. Braverman's "absolutely unbounded love for his son"); Liana Myagkov Ltr. ("it's easy to tell that he means the world to his son").

In what was described by one relative as a "courageous act," Mr. Braverman "honestly explained everything to [his] child". Ex. 3 (Natalia Khokhlova-Prokovskaya (aunt) Ltr.); *see also* Ex. 2 (Anastasiya recounts how "Dima explained to our son mistake he made, told how sorry he is for making this bad choice and discussed possible consequences for his actions."). One friend observed

10

that Mr. Braverman chooses to spend time with his son, rather than with his friends. Ex. 4 (Peter Shvets Ltr.). In fact, those who have had the privilege to be around Mr. Braverman and his son cannot help to feel inadequate as parents to their own children. *Id.* ("Frankly, I sometimes feel I am not as good father as he is!"); *see also id.*, Igor Schtein Ltr. ("Frankly, seeing Dmitry so lovingly attending to his boy made me regret my own lack of tolerance when dealing with my kids.").

To sum up, as one friend noted, "family wellbeing is the most important thing for him". Ex. 4 (Alexey Kuxin Ltr.).

### (b) Mr. Braverman is a Selfless Friend

In addition to his close family, Mr. Braverman has strong, long-lasting friendships, which are another testament to his good moral character. His aunt, Svetlana Zhornitskaya, describes how his "childhood friends have remained his good friends! He has maintained friendships (even when he was in another country!) with classmates from kindergarten, school, and university.". Ex. 3. His mother notes that "in day care he made his first friends who he still keeps in touch with to this day." Ex. 3 (Eteri Zhornitskaya Ltr.).

Mr. Braverman's inclination toward empathy, patience, and compassion began as a boy. Vita Droutman, who has known Mr. Braverman her entire life, recounts how growing up with him, he was "the most fare person" in their group of friends, and "in time of conflicts he was the one who could compassionately hear both sides." Ex. 4.

Mr. Shvets, who posted bail for Mr. Braverman, depicts how Mr. Braverman helped him through a difficult time in his life. He describes how when he went through some family troubles, Mr. Braverman was the first person he turned to for support, and when he lost his job in 2008, Mr. Braverman devoted countless hours to teaching him computer skills to make him more marketable. Ex. 4. Mr. Braverman is the type of person who gives even when not asked. Mr. Shvets describes how one time he was helping his parents move and had reached out to friends to help but did not

11

ask Mr. Braverman because he suffers from back problems, but Mr. Braverman learned through the grape-vine and showed up to lend a hand. He also describes how he started a small consulting company with Mr. Braverman and found him to be "respectful, honest, committed and selfless". *Id.* It is thus not surprising that when Mr. Braverman needed his help, Mr. Shvets posted bail for him without a question.

Giving back to his community is second nature for Mr. Braverman. Valerie Yevtushenko describes how Mr. Braverman has "donated countless hours" to help individuals immigrate to this country, giving back the warm welcome that he had received from her own parents when Mr. Braverman and his parents arrived in San Francisco. Ex. 4. Another friend opines that Mr. Braverman "truly enjoys helping people and does it from the bottom of his heart. . . . [and] almost never asks for anything in return." *Id.*, Liana Myagkov Ltr.; Oleg Kozyrev Ltr. (describes how Mr. Braverman helped him learn a computer program and prepare for an interview); Tatyana Shvets Ltr. (recounts how Mr. Braverman volunteered driving lessons to her mom so that she could obtain a license and start working, and how he helped her father find a job); Jacob Sherman Ltr. (notes that through the tenure of their lengthy relationship, Mr. Braverman has provided him with over 200 hours of free consultation); Victoria Peraza Ltr. (describing Mr. Braverman as having a "big heart" and "who never says 'NO' when asked for help").

It is no surprise then that Inna Merzheritsky – who describes Mr. Braverman as "one of the kindest and selfless people" she knows – and her husband Dmitry Dolinsky – who depicts Mr. Braverman's "unselfish interest in his friends' lives" – elected for Mr. Braverman and his wife to be custodians of their children in their will. *See* Ex. 4. Just like his relatives, his friends have found that Mr. Braverman is nothing but dependable. *See id.*, Marina Kogan Ltr. ("you can always count on him").

12

One former co-worker of Mr. Braverman at Wilson Sonsini, Karen Olson, wrote a letter despite the fact that she is still employed at the Firm, which discouraged writing letters in support of him. *See* Ex. 4, Mary Ryan Ltr. ("I have personal knowledge of other current WSGR employees who would have liked to have sent in letters of support for Dmitry, but were discouraged by the firm from doing so."). Ms. Olson recounts how Mr. Braverman "went out of his way to help" her and others at the firm, was a team player, and really cared about doing a great job. *Id.* (Karen Olson Ltr.). She opines that "[e]veryone at work that knows Dmitry could attest that he is an extremely considerate and kind person". *Id.* But the way she ends her letter, aptly sums it up: "I know, in my heart and mind, Dmitry is a good person." *Id.*

Another Wilson Sonsini colleague, who is now retired, characterizes Mr. Braverman as "unfailingly pleasant", remarking that he would "always smile". Ex. 4 (Mary Ryan Ltr.). That particular trait – that Mr. Braverman is a positive person – is noticed by many who wrote letters on his behalf. Ex. 4, Tatyana Shvets Ltr. (describes him "as a positive thinker no matter what he or his family goes through"); Karen Olson Ltr. ("I know Dmitry will try to relieve any stress he could from his son by trying to stay positive about life . . ."). And even in this greatest time of adversity, his wife observes that "despite his own torment he pulls himself and tries his best to stay positive for his son and close ones every day." Ex. 2.

Given what a gem Mr. Braverman is to his family, and his community of friends, it is difficult to understand how he exercised such poor judgment. One friend described the bewilderment that is a recurring theme in many of the character letters as follows:

> I obviously don't know all the details of this case, but the whole story seems utterly out of character for Dmitry – this is not how he lives his life in any other regard. I have no explanation that would make any sense as to how this story came to be and developed. Lack of judgment? Misunderstanding of company policies and procedures? Misinterpretation of insider trading laws? Whatever led to the factual outcome, I'm sure by now Dmitry regrets his actions more than he can ever say and feels hugely remorseful.

Ex. 4 (Boris Droutman Ltr.).

Another friend, Alyona Doubrovina, described the aberration in character quite well: "this unfortunate incident does not define him as a person and is not representative of his values." Ex. 4; *see also id.*, Yuri Kaplan Ltr. (describing this as "completely out of his personality").

In summary, Mr. Braverman's commitment and bond to his family and friends speaks volumes about the type of person he is and demonstrates that this offense is not indicative of who he really is.

### 3.   *Remorse & Acceptance of Responsibility*

Mr. Braverman deeply regrets his mistakes. He assured this Court that there will not be a repeat of his past offenses, remarking:

> I had a long time to reflect on what have I done. I regret harm and trauma I caused to my family. My biggest regret is that I let myself rationalize that if I'm going to help my family and will not really hurt anyone then somehow it's ok to break a rule. The law has to be obeyed regardless of my motives or intentions. This is the lesson I will take from this experience and promised to myself never to repeat this mistake again.

*See* Ex. 1.

Nobody knows better than Anastasiya how genuine Mr. Braverman's remorse is. She describes it vividly in her letter:

> My husband made the wrong choice and he regrets it every day. All the hard work both of us put in, all the energy we devoted into building better future for our family got wiped out with his mistake and realization what have happened and how this is causing lots of suffering to our family is catastrophic for my husband. Feeling that he can't switch time back and fix this mistake causes him great amount of pain. Great sorrow and apology I see in my husband's eyes.

Ex. 2.

Mr. Braverman's brother, Igor, has also observed his remorse first-hand, and has seen how the current circumstances have affected him. He describes how they speak frequently and how he "can feel the remorse and desperation in his voice" and that Mr. Braverman's actions have "caused lots of suffering for him and his family". *See* Ex. 3. Mr. Braverman's close friend, Peter Shvets describes how "deeply ashamed" Mr. Braverman is, and that he has seen the remorse "in his eyes, in

14

his changed behavior" and knows that the remorse is sincere. *See* Ex. 4. Another friend opines that Mr. Braverman's acceptance of responsibility by pleading guilty "characterizes him as a positive person" who "wants to be honest with people, Government and his family." *Id.* (Yulia Dorokhova Ltr.). As his good friend Stefan Pules summarizes, "Dmitry recognizes his mistakes, and he would not repeat them." *Id.*

In an effort to take full responsibility for his actions, Mr. Braverman pleaded guilty. He would have done so sooner but for the disagreement with the U.S. Attorney's Office regarding the application of an abuse of trust/special skill enhancement. Because of that disagreement, he did not enter into a plea agreement with the U.S. Attorney's Office. In addition to pleading guilty, Mr. Braverman also entered into a settlement agreement with the U.S. Securities Commission in which he agreed to disgorge $306,658.33, which represents the profits gained as a result of his offense, plus a penalty amount of $204,438.89, plus prejudgment interest of $9,336.41, for a total of $520,433. *See* Ex. 7 (Judgment). Given Mr. Braverman's sincere remorse, and his swift affirmative steps to accept responsibility for his actions, a custodial sentence would be greater than necessary to achieve the purposes of 18 U.S.C. § 3553.

**B.    The Nature & Circumstances of the Offense Do Not Support a Two Point Enhancement and Instead Weigh in Favor of Leniency**

We respectfully submit that a non-Guidelines and non-custodial sentence is supported in this case given the nature and circumstances of the offense. The nature and circumstances of the offense is directly pertinent to the Government's position (adopted by the PSR) that an abuse of trust/special skill enhancement should apply. The Government's advocacy for an enhancement is based on a significant mischaracterization of the offense conduct. The Government argues for an

15

enhancement based on its claims that (1) Mr. Braverman used his "computer prowess"[4] to obtain the information, and (2) he had special access to the information given his position in the IT department. Neither claim is well-founded.

First, it is important to appreciate Mr. Braverman's job at Wilson Sonsini. He began working there in October 2000 as a Programmer Analyst in the Information Systems Applications department. In 2006, he was promoted to Senior Information Systems Engineer. In that position, which he held for the rest of his tenure at the Firm, he had no supervisory responsibility and was three steps removed from the Chief Information Officer. The PSR inaccurately describes Mr. Braverman's "primary job responsibility" as "maintain[ing] and design[ing] software in connection with the Law Firm's finance function." PSR ¶ 6. In fact, Mr. Braverman did not design or maintain any software having to do with the Firm's "finance function". Mr. Braverman designed the New Matter Intake System. The Firm's finance department used the Client Management System - software made by Aderant - which the Firm purchased in order to manage client billing and other finance functions. One of Mr. Braverman's colleagues in the IT department maintained the Client Management System. During his tenure, Mr. Braverman worked on projects, many of which pertained to the Firm's financial data, but his work on those projects is irrelevant to the offense conduct.

With respect to the offense conduct, Mr. Braverman did not use any special computer skills to access the information that he used to inform his trades. And he certainly did not use any of his programming skills. Instead, he used the same skills that all modern-day users of computers employ – the ability to type and do simple searches in programs that were accessible to many employees of the Firm. He merely searched in the New Matter Intake System for the category "mergers and

---

[4] *See* FBI Press Release after arrest, dated September 16, 2014, and attached hereto as Ex. 5 (alleging that Mr. Braverman used "his computer prowess to snoop on deals and get inside information.").

acquisitions" to get the matter number and then reviewed attorney's billable time in the Client

Management System to see when the billing would increase, indicating to him that a possible merger

or acquisition was imminent. Mr. Braverman's computer software skills did not enable him to access

confidential information, and his position within the firm did not give him unique access to the

Firm's databases. He inferred the likelihood and timing of upcoming mergers based on confidential

information that was accessible to various categories of law firm employees. He did not have access

to the Firm's document management system, and thus did not base his trading on any Word or

other documents that detailed the upcoming mergers.

Based on these facts, a two-point enhancement for abuse of trust/special skill is not

warranted. First, the applicable Guidelines specifically state the limited circumstances in which the

enhancement applies in insider trading cases. The two relevant Guidelines are as follows:

> (1) Application Note 2 of Section 2B1.4, which applies to insider trading, states that the
> enhancement in Section 3B1.3 "should be applied if the defendant occupied and abused a
> position of *special* trust. Examples might include a corporate president or an attorney who
> misused information regarding a planned but unannounced takeover attempt. It typically
> would not apply to an ordinary "tippee". (Emphasis added).

> (2) Section 3B1.3 provides in part that: "If the defendant abused a position of public or
> private trust, or used a special skill, *in a manner that significantly facilitated* the commission or
> concealment of the offense, increase by 2 levels." (Emphasis added).

Application Note 2 of Section 2B1.4 dictates the analysis in this insider trading case. Mr. Braverman

did not abuse a position of "special trust", as required by the clear language of the Guidelines. His

offense conduct – insider trading – by definition involved abusing the trust of his employer. This is

true for all insider trading cases in which an employee misappropriates information in breach of a

duty owed to his employer.[5] But the Application Note makes clear that the enhancement should

only apply in insider trading cases where the defendant "occupied and abused" a position of "special

---

[5] Indeed, under the misappropriation theory of insider trading, "a person commits fraud . . . when
he misappropriates confidential information for securities trading purposes, in *breach of a duty owed to
the source of the information. . ..*" *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (emphasis added).

trust". It further provides examples of those limited positions that qualify for the enhancement – noting, for example, that the enhancement "should be applied" if the defendant is one who regularly participates in securities transactions – such as a hedge fund professional or certain lawyers - *if* the defendant used that position "to facilitate significantly the commission or concealment of the offense". Section 2B1.4, App. Note 2.

There are no reported cases in which Application Note 2 to the insider trading Guideline is analyzed. But when Section 2B1.4 was last amended (effective November 2012), the drafters specifically amended the commentary "to provide more guidance on the applicability of §3B1.3 (Abuse of Position of Trust or Use of Special Skill) in insider trading cases." Guidelines, dated Nov. 1, 2012, Supplement to Appendix C, Amendment 761 ("Am. 761") at 5. A paragraph was added to describe situations in which the enhancement should apply, with a focus on financial services professionals (including lawyers) who provide professional assistance in securities transactions – because in those situations, the client has entrusted them with a special duty. Thus, the drafters explain that "[i]ndividuals who occupy such positions possess special knowledge regarding the financial markets and the rules prohibiting insider trading, and generally are viewed as more culpable." *Id.* at 6. Indeed, the Application Note specifically states that the enhancement "ordinarily would not apply to a position such as a clerical worker in an investment firm". Section 2B1.4, Note 2. The drafters explained this addition: "Such a position ordinarily does not involve special skill and is not generally viewed as more culpable." Am. 761 at 6. That aptly describes Mr. Braverman. Application of the enhancement in this case would effectively mean that every insider trader who misappropriates information from his employer is subject to the two-point abuse of trust enhancement.

Courts that have written about application of the enhancement in cases outside the insider trading context have stressed that there must be a showing that the defendant violated a duty of

trust to the *victim*, and that defendant's position involve discretionary authority. *See United States v. Jailall*, 00 Cr. 0069-01 (RWS), 2001 WL 406205, *2 (S.D.N.Y. Apr. 20, 2001) (rejecting two-point enhancement where defendant's duties vis-à-vis the bank where he worked and its customers were "entirely ministerial and devoid of the type of discretionary authority contemplated by Section 3B1.3").[6] Thus, the facts here would not warrant an enhancement even under Section 3B1.3 which makes clear that the "public or private trust" refers to a position of trust "characterized by professional or managerial discretion" that are "ordinarily subject to significantly less supervision". Section 3B1.3, Application Note 1.[7]

When analyzing a position, the case law counsels that a court must determine the "extent to which the [defendant's] position provides the freedom to commit a difficult-to-detect wrong." *United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001) (internal quotation and citation omitted). For that to be true, "the defendant's position must involve discretionary authority." *Id.* And, "this discretion must have been entrusted to the defendant by the victim." *Id.* Thus, whether a position is one of trust "is to be viewed from the perspective of the offense victims". *United States v. Thorn*, 317 F.3d 107, 120 (2d Cir. 2003). As the Second Circuit observed, the examples given in the Commentary to Section 3B1.3 "each involve situations in which the defendant occupies a position vis-à-vis the victim that is in the *nature of a fiduciary relationship*." *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996) (emphasis added). That is not the case here. The true victims of insider trading are the participants in the stock market – who clearly did not entrust Mr. Braverman with anything.

---

[6] Cases that have analyzed application of the enhancement outside the insider trading context have noted that access to information is not sufficient to establish a violation of the trust to the victim. *See, e.g. United States v. Adams*, 03 CR 1368 (ARR), 2006 WL 229904, * 8 (E.D.N.Y. 2006) (airport employees with security clearances do not occupy positions of trust).

[7] The adjustment is inapplicable if an abuse of trust or skill is included in the base offense level. *See* Section 3B1.3 ("This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."). Here, the base offense level for insider trading at 8 is already higher than the base offense level starting at 6 for a more regular crime of fraud. *See, e.g.*, Section 2B1.1 (fraud and deceit).

But even if the victim is defined to include Mr. Braverman's employer from whom he misappropriated information, Wilson Sonsini did not place any special trust in Mr. Braverman. He was not entrusted with safeguarding the information that he used to facilitate his trades. He was among the lowest level of employees in the IT department. He had no supervisory responsibility and was three steps removed from the Chief Information Officer. Nor did Mr. Braverman have a fiduciary relationship with Wilson Sonsini's clients. Those clients, contrary to the Government's representation, did not entrust him with anything. *See* Ex. 5 (FBI Press Release, dated Nov. 13, 2014, quoting U.S. Attorney Preet Bharara: "Dmitry Braverman abused the trust not only of his employer, a major law firm, but also of the numerous companies that relied upon the law firm to handle sensitive matters.").

Finally, Mr. Braverman did not use any technical or programming skills to access the information that he used to make his trades. Application Note 4 to Section 3B1.3 defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." Moreover, whether Mr. Braverman's computer skills qualify as a special skill is irrelevant, because he did not *use* those skills to access the information. Rather he searched the New Matter Intake System, which classified cases by category, and attorney billable time, in order to try to ascertain when a merger of a firm client was likely to occur. He then made educated guesses based on this information. He did not have any type of unique access to the New Matter Intake System. The entire Conflicts group, the Financial Planning and Forecast Group, legal secretaries, many employees in the finance department, and many programmers in the IT department could access the New Matter Intake System. Additionally, except for the Conflict group, these categories of employees also had had access to attorney billables, except that secretaries might have access only to the time sheets for the attorneys they serviced. Because he did not use a "special

20

skill, in a manner that significantly facilitated the commission or concealment of the offense," it is
not appropriate to apply the enhancement. Section 3B1.3; *see also* Application Note 2 to Section
2B1.4 (The enhancement "ordinarily would not apply to a position such as a clerical worker in an
investment firm, because such a position ordinarily does not involve special skill.").

The facts of this case are starkly different from those insider trading cases in which the
enhancement was included in the Guideline calculation, which was often pursuant to a plea
agreement with no input from the Court, and where the defendant occupied the type of senior-level
position – such as a hedge fund manager – that is specifically described in the Note to Section
2B1.4. *See, e.g.* Ex. 6 (Press Releases Attached relating to Frank Hixon, Jr. (Senior Managing Director
of an investment fund); Michael Lucarelli (Director of Market Intelligence at an investor relations
firm); Stanley Ng (SEC Reporting Manager of a public company); *see also* King Chuen Tang (CFO of
private equity fund); Scott London (Senior partner at KPMG who supervised more than 500
accounting professionals)).

Mr. Braverman engaged in illegal conduct, but his conduct is different than the typical
insider trader in that he made calculated guesses based on the information he had, rather than
trading on the precise details of upcoming mergers for which he never had access to in his job as a
low-level IT employee at a law firm. Accordingly, given the nature of his offense, not only is a two-
point enhancement for abuse of trust/special skill not justified, but a sentence in this case that
involves any institutional incarceration would be significantly greater than necessary to achieve the
purposes of 18 U.S.C. § 3553.

## C.     The Need to Promote the Purposes of Sentencing

Section 3553(a) directs the Court to consider the purposes behind sentencing including the
need for the sentence to (i) reflect the seriousness of the offense, to promote respect for the law, to
provide just punishment for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii)

to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed training, medical care or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). We submit that the consequences already suffered by Mr. Braverman have served as ample punishment and deterrence.

### 1.     *Mr. Braverman Has Already Been Severely Punished*

Mr. Braverman has already suffered greatly from his actions. He lost his job of more than thirteen years at Wilson Sonsini. He has a felony conviction that will be on his record forever. He has already experienced the inevitable barrier to re-employment when he recently obtained an offer of employment contingent on a background check. Furthermore, the publicity surrounding his case has scarred his reputation forever and will severely handicap his future job prospects. The punitive effects of the press coverage are exacerbated by the fact that the press releases in this case mischaracterized the facts and painted him as a conniving criminal mastermind. Specifically, the Government issued various press releases that inaccurately suggested that Mr. Braverman was able to steal the information because of his computer skills. *See* Ex. 5 (FBI Release dated Sept. 16, 2004, stating "Braverman used his computer prowess to snoop on deals and get inside information."); (FBI Release dated Nov. 13, 2014, stating "BRAVERMAN . . . was primarily responsible for maintaining and designing software . . . .. BRAVERMAN consequently had computer and database systems access to confidential information…").

As recently noted in a Report by the NACDL, the collateral consequences of conviction including "generalized discrimination and social stigma – have become more severe, more public and more permanent." Ex. 8 (Excerpt of "Collateral Damage: America's Failure to Forgive or Forget in the War on Crime", May 2014, at p.12)[8]. It is thus no understatement that "[c]ollateral

---

[8] The entire report is available on the NACDL's website at:
http://www.nacdl.org/restoration/roadmapreport/

consequences can be a criminal defendant's most serious punishment, permanently relegating a person to second-class status." *Id.* In addition to the press, Mr. Braverman also quickly learned that financial institutions did not want to associate with him anymore, and all of his bank accounts were closed. As he explains, it was at that moment, that he "started to feel very isolated" from society. Ex. 1. Just this month, the financial institution that housed his 401k account informed him that it will liquidate his account, possibly subjecting him to tax consequences, if he does not transfer the funds to a different institution. *Id.* Thus, there are significant obstacles to Mr. Braverman's ability to make a fresh start.

Finally, Mr. Braverman has already suffered a financial blow that will shadow his family for decades. In an effort to accept responsibility for his actions and do so swiftly, he reached a settlement with the SEC, in which he agreed to disgorge all the profits, pay a hefty penalty, and prejudgment interest, amounting to a judgment totaling $520,433 dollars. This judgment has decimated his family's finances and serves as a daily reminder of the terrible mistakes he made.

Thus, in light of the serious consequences that Mr. Braverman has already suffered – and will continue to suffer – a sentence involving any amount of incarceration would be greater than necessary to achieve the purposes of 18 U.S.C. § 3553.

### 2.    *The Purposes of Deterrence Have Already Been Served*

We also respectfully submit that the needs of deterrence are fully served by a non-custodial sentence. As to individual deterrence, as detailed above, Mr. Braverman and his family have already suffered so much by virtue of this prosecution that there is no need for further punishment to assure that he is adequately deterred in the future. One friend, Valerie Yevtushenko observed that "this unfortunate incident caused them immense hardship and personal suffering". Ex. 4.

Another close friend of the family, Yuriy Grinberg, describes the effect that this has had on Mr. Braverman's family:

Just last week on Jan 2nd 2015 we got together to celebrate the new year and it is striking how hard this case is on Dmitry's family, his son, always joyful and happy, seemed quiet and withdrawn, it breaks my heart. Whatever support my family and I can offer, we still can't hope to meaningfully lessen the impact of this case on [his] family."

Ex. 4.

Given the support and scrutiny of his family and friends, it is inconceivable that Mr. Braverman will ever commit another crime. His family, friends and community need him. *See* Ex. 2 ("I need Dmitry to raise our son, support our parents and give back to community.").

As to general deterrence, we respectfully submit that the consequences that have befallen Mr. Braverman by virtue of his offense – namely, a felony conviction, the over half of a million dollar judgment against him, loss of employment and public humiliation – will more than adequately deter others from committing a similar offense. And, as discussed above, the significant press coverage, including articles in the New York Times and Wall Street Journal following Mr. Braverman's arrest and guilty plea serve as continuing general deterrence. *See, e.g. Employee of Law Firm Wilson Sonsini Charged with Insider Trading*, DealBook, The New York Times (Sept. 16, 2014); *Law Firm Employee Pleads Guilty to Insider Trading*, Wall Street Journal (Nov. 13, 2014).

Accordingly, the purposes of deterrence have already been served and there is no need to impose a custodial sentence. *See* David Weisburd *et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) (offenders given terms of probation were no more or less likely to re-offend than those given prison sentences); Gary Kleck, *et al., The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005) ("There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms.").

### 3.     *There Is No Need to Protect the Public From Mr. Braverman*

A sentencing court is also tasked with imposing a sentence that will protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(C). As detailed above, Mr. Braverman poses

no risk of recidivism. He is surrounded by family and friends who will ensure that he does not engage in destructive, desperate acts again. This is not a situation in which a sentence of imprisonment is necessary to protect the public from him.

    4.    *Mr. Braverman Does Not Need Treatment*

Finally, a sentencing court must consider the need for the sentence imposed to provide the defendant with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). This does not apply here. Mr. Braverman is both physically healthy and mentally stable, and has continued to try to provide for his family since the day he was placed on unpaid leave from Wilson Sonsini. Incarcerating Mr. Braverman will not help to rehabilitate him. Rather, the ability to remain with his family and continue to try to provide for them is the most effective mechanism for him to begin to reconstruct his life. Requiring him to engage in substantial community service, for example, would allow him to give back to his community in a constructive and effective manner.

**D.    The Kinds of Sentences Available**

In fashioning a just sentence, Section 3553(a)(3) requires the Court to consider the "kinds of sentences available." Notably, the Sentencing Commission has found that probation can satisfy the purposes of sentencing, including providing just punishment for the offense. *See* U.S. Sentencing Guidelines Manual, Chapter 5, Part B, Introductory Cmt.

We respectfully request that Court consider every possible way to punish Mr. Braverman short of institutional incarceration, including a combination of community service and home confinement or community confinement. *See* U.S. Sentencing Guidelines Manual, §§ 5F1.2 and 5F1.3. Home detention would amount to a meaningful punishment because it would severely restrict the activities that he enjoys on a daily basis with his wife and son, but still allow Mr. Braverman to remain with them. Ordering a significant amount of community service as a condition of probation

would also be punitive in that it would limit the amount of time that Mr. Braverman could devote to seeking employment and contributing financially to his family.

### E.   The Need to Avoid Unwarranted Sentence Disparities

Section 3553(a)(6) requires the Court to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records" who have been found guilty "of similar conduct." A non-Guidelines sentence is consistent with punishments imposed in this and other districts on other defendants who have plead guilty to insider trading. *See, e.g. United States v. Kwok*, 12 Cr. 00405, Dkt. # 14 at p. 6 (Sentencing Transcript) (S.D.N.Y. October 17, 2012) (former Yahoo! Inc. executive sentenced to two years of supervised release after trading on inside information received from an individual, and in turn providing tips to that individual); *United States v. Okada*, 07 Cr. 144 (DC), Indictment, Dkt. #1, Judgment, Dkt #18 (S.D.N.Y. April 26, 2008) (defendant sentenced to probation for profiting $300,000 on trades made on inside information and making false statements to the FBI); *United States v. Mityas*, 12 Cr. 133, Dkt. # 17 (Judgment), # 13 (Sentencing Memo at 13) (E.D.N.Y. Aug. 13, 2012) (partner at global consulting firm who traded based on client's confidential information sentenced to 3 years supervised release); *see also United States v. Robarge*, No. 11 Cr. 802 (D.N.J. 2011) (imposing sentence of 1 year supervised release where the Guidelines range was 30-37 months for defendant who traded on inside information and tipped his good friend about his company's performance).

Were this Court to impose a term of confinement, an examination of sentences of defendants in insider trading cases demonstrates that going below the Guidelines would be necessary to avoid unwarranted disparities. Courts have imposed sentences significantly less than the Guidelines range for defendants who realized higher gains and engaged in more egregious conduct. For example, in *United States v. Brownstein,* No. 11 Cr. 904 (RPP) (S.D.N.Y. October 21, 2011), the defendant, Drew Brownstein, pleaded guilty to purchasing stock in Mariner Energy after learning

from a friend whose father was on the board of the company that it was about to be acquired. Based on this direct information of an upcoming merger, Brownstein reaped profits of $2.4 million, more than eight times the amount of profit made by Mr. Braverman based on his educated guesses. Judge Patterson sentenced the defendant to one year and one day in prison, more than two-thirds below the advisory Guidelines range of 37-46 months. *See* Brownstein, No. 11 Cr. 904, Judgment (Dkt. No. 15) (S.D.N.Y. Jan. 18, 2012).

In *United States v. Whitman*, No. 12 Cr. 125 (JSR), Dkt. #117, at 1, 148 (S.D.N.Y. 2012), the defendant faced a Guidelines range of 51-63 months after having profited $935,306 as a result of trading on inside information that he had gained from multiple sources as the owner and manager of a $100 million hedge fund. Judge Rakoff, after a trial and despite his expressed certainty that Whitman had perjured himself at trial, nonetheless sentenced Whitman to 24 months, less than half of the Guidelines range, based in large part on his view of Whitman's total character. He distinguished between a defendant whose Guidelines calculations may have been the same, but who was instead a "grasping, evil, crooked, despicable human being" and Whitman, who was "basically a good person but has made some intentional mistakes." *See* Sentencing Transcript at 5, 28 (S.D.N.Y. Jan. 24, 2013).

Accordingly, a non-Guidelines sentence, and a non-custodial sentence, is "sufficient, but not greater than necessary" and will avoid "unwarranted sentence disparities". 18 U.S.C. § 3553(a)(6).

**F.**     **The Need to Provide Restitution**

Finally, 18 U.S.C. § 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense." Insider trading offenses are considered to be a fraud on the market with no direct victims. The PSR notes that restitution is not applicable. PSR ¶ 99. Mr. Braverman has agreed to disgorge his ill-gotten gains, plus pay a penalty to the SEC. As a result of the settlement, various accounts have been forfeited to the SEC. His first payment of $50,000 is due on

September 15. *See* Ex. 7 (Judgment), p.8. We respectfully submit that in light of the SEC judgment of $520,433, this Court should not impose any additional financial burdens on Mr. Braverman and his family. *See United States v. Madden*, No. 09 Cr. 799 (RWS), 2011 WL 4359933, at * 9 (S.D.N.Y. Sept. 19, 2011) ("In consideration of the significant amount of restitution and forfeiture Defendant will be paying, the fine in this case shall be waived.").

* * *

Based on all of the foregoing, we respectfully submit that consideration of the relevant Section 3553(a) factors should result in a sentence that does not involve any institutional incarceration. A sentence that involves home confinement and substantial community service would serve as just punishment. Mr. Braverman's criminal conduct was a clear aberration. There is no chance of recidivism. He is deeply ashamed and took every action to swiftly accept responsibility (both criminally and civilly). He has begun to heal the damage that he has caused to his loved-ones, who support him fully and have forgiven him. He has tried to be a productive member of society even after his arrest, finding temporary employment, and continuing to provide for his family. Given a chance, Mr. Braverman will continue to be a productive member of our society. Mr. Braverman's father-in-law, whose name was used to commit these crimes, makes this last point clear and submits a powerful plea on his behalf:

> Unfortunately somewhere in his activities Dmitry made a mistake that led to this litigation. My initial reaction was anger and disappointment I could not believe that Dmitry used my name for actions that could jeopardize my daughter or my grandson. With time my anger has lessened and I could forgive Dmitry. I had many phone conversations with my daughter and son-in-law. I know he is very regretful for the actions he did and trying very hard to correct it.
>
> I do not think that Dmitry ever wanted to intentionally harm the firm where he worked, and even more the state in which he lives. I believe he has never meant to let me down, or any other member of his family. I see what a powerful lesson [this] is for Dmitry and I have no doubt that he will remember this lesson for a lifetime and will continue to be a worthy citizen of his new country.
>
> I ask you, Mr. Judge, taking into account Dmitry Braverman's remorse, his good past and in the interest of his young son, to be merciful in your decision for Dmitry's punishment.

Ex. 3 (Vitaly Pupynin Ltr., Translated).

28

## CONCLUSION

For all the foregoing reasons, we respectfully request that the Court impose a non-custodial,

non-Guidelines sentence.

Dated: New York, New York
      July 15, 2015

SERPE RYAN LLP

By:

Silvia L. Serpe (SS-1845)
Paul W. Ryan
1115 Broadway, 11th Fl.
New York, NY 10010
212-257-5010
sserpe@serperyan.com

*Attorneys for Defendant Dmitry Braverman*

29

## INDEX OF EXHIBITS

| Ex. 1 | Letter to the Court by defendant Dmitry Braverman. |
|-------|---------------------------------------------------|
| Ex. 2 | Letter to the Court by defendant's wife, Anastasiya Pupynina. |
| Ex. 3 | Letters to the Court by defendant's relatives, arranged alphabetically by last name. |
| Ex. 4 | Letters to the Court by defendant's friends, arranged alphabetically by last name. |
| Ex. 5 | FBI Press Releases, dated September 16, 2014, and November 13, 2014, regarding defendant. |
| Ex. 6 | Press Releases pertaining to Frank Perkins Hixon, Jr., Michael A. Lucarelli, Stanley Ng, King Chuen Tang, and Scott London. |
| Ex. 7 | Final Judgment as to Defendant Dimitry Braverman, *SEC v. Braverman et al.*, 14 Civ. 7482 (RMB), dated June 15, 2015. |
| Ex. 8 | Excerpts of the NACDL's report titled, "Collateral Damage: America's Failure to Forgive or Forget in the War on Crime". |